## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FAMOUS INTERNATIONAL** | **: CIVIL ACTION** |
| **MARKET**, *et al* | : |
| | : |
| **v.** | : |
| | **: NO. 17-4897** |
| **UNITED STATES OF AMERICA** | : |

**KEARNEY, J.**                                                    **June 15, 2018**

## MEMORANDUM

Congress funds the purchase of groceries by qualified households through the Supplemental Nutrition Assistance Program known as SNAP. The United States provides an electronic card, similar to a debit or credit card, to qualified households funded at the beginning of each month. The purpose is to allow qualified households to use the SNAP card to purchase groceries. Grocery retailers must qualify to accept the SNAP funding. A repeated and unfortunate problem arises when retailers provide cash, instead of groceries, for debiting the qualified household's SNAP card. In other words, using the SNAP card as a bank debit card for cash not groceries. The United States investigates questionable transactions particularly large dollar and repeated transactions in a short period of time. With sufficient evidence, and after providing notice and extensive opportunity to address specific concerns, the United States may permanently disqualify a retailer from SNAP. We today address the United States' disqualification of a retailer it found to be engaging in hundreds of questionable large sum and repetitive transactions atypical of its store size, inventory and operational capacity. The retailer bears the burden of proving the propriety of the challenged transactions. After careful study, we find the retailer cannot meet its burden to overcome substantial evidence and we grant the United States' motion for summary judgment in the accompanying Order.

## I.  Undisputed Facts[1]

Famous International Market is a Philadelphia grocery store and once an authorized retailer under the Supplemental Nutrition Assistance Program ("SNAP").[2]  In addition to standard food products found in a traditional grocery store, the Market also sells South Asian and Halal food offerings.  SNAP provides qualifying households with funds each month to purchase qualifying food items from their choice of authorized SNAP retailers.  The Market became an authorized SNAP retailer in 2012.[3]  As an authorized SNAP retailer, the Market accepted payment from customers who receive SNAP benefits by swiping the customer's electronic benefit transfer ("EBT") card, similar to a debit card.[4]  The Food and Nutrition Service under the United States Department of Agriculture administers SNAP.  The Service tracks each SNAP household's use of its SNAP benefits through the EBT point of sale system found in each SNAP retailer's location.  Each time a SNAP participant uses his EBT card as payment, the EBT point of sale system collects and sends data to the Service.  The Service aggregates the data and analyzes it though the Anti-Fraud Locator Using Electronic Benefit Transfer Retailer Transactions ("ALERT") system.  The ALERT system is designed to detect suspicious SNAP benefit usage indicative of fraud or SNAP benefit trafficking.

### *The Food and Nutrition Service investigates and charges the Market with SNAP benefit trafficking.*

In late 2016, the ALERT system identified the Market as a potential source of SNAP benefit trafficking based on the past six months of EBT card usage at the store ("the review period").[5]  The ALERT system identified unusually large transactions and transactions made in quick repetition at the Market.

The Service launched an investigation.[6]  The Service sent an investigator to the Market to gather information on its store layout and product offerings.[7]  The investigator reported the

2

Market had one EBT point of sale device, one cash register, and did not have an optical scanner to scan food items to tally up purchase totals.[8] The Market did not have a conveyor belt to facilitate the tallying process and did not have a bagging area. The investigator observed beef, lamb, chicken, and fish in a walk-in cooler and in a freezer.[9] But the investigator did not observe meat or seafood specials or bundles.[10] The Service also relied on past investigator visits and reports.[11] In the investigation reports, each investigator estimated the size of the Market differently, including estimates of 1,200, 2,400, and 3,800 square feet.[12]

During their investigation, the Service completed a "scan flag comparison" which compared the amount of transactions flagged as repetitive or high dollar during the review period at the Market to three comparison stores.[13] The Market processed 1,823 SNAP transactions during the review period. Of those transactions, the Service flagged ninety-six as repetitive and 506 as high dollar transactions. The Service categorized the Market as a "medium grocery store." During the review period, a similar medium grocery store processed 5,307 SNAP transactions. Of those transactions, the Service flagged 139 as repetitive transactions and 918 as high dollar transactions. The Service compared the Market to another similar medium grocery store. The store processed 3,629 SNAP transactions during the review period. Of those transactions, the Service flagged only forty as repetitive transactions and 340 as high dollar transactions. Finally, the Service compared the Market to a large grocery store which sold similar international food products. The store processed 12,041 SNAP transactions during the review period. Of those transactions, the Service flagged eighty-three as repetitive and ninety-six as high dollar transactions.

Shortly after receiving its most recent investigation report, the Service completed an ALERT case analysis on the Market summarizing its investigation findings.[14] The Service found

3

the Market has a walk-in cooler estimated at 250 square feet and five chest freezers.[15] The chest freezers contained frozen vegetables and bread products, with some meat products.[16] The meat in the chest freezers were not packed in large or bulk packaging.[17] The walk-in cooler held boxes of vegetables, a single leg of beef, and a few other section cuts of beef.[18] The Market had a meat preparation area, but the investigators found no indication the Market sold meat in bundles or large packages.[19] The Market did have a few items available in bulk, including rice and powered milk products.[20]

The Service's case analysis identified two categories of transactions indicative of trafficking: "rapid and repetitive transactions" from the same SNAP household, and "high dollar transactions." The Service identified forty-seven sets of repetitive transactions from thirty-eight unique households.[21] The Service identified 400 high dollar transactions which amounted to at least five times the average transaction for the same store type in Pennsylvania.[22] Comparing these transactions to the offerings identified from the investigator report, the Service concluded these transactions indicated SNAP benefit trafficking took place at the Market.

The Service also compared the Market's EBT transaction data to similar authorized SNAP retailers within a one mile radius.[23] The Service identified twenty-one authorized SNAP retailers located within a one mile radius of the Market, including four supermarkets and three superstores.[24] The Service compared the Market's EBT transaction data with three stores which also sold either Asian or Halal foods. The Service categorized two of the comparable stores as medium grocery stores, like the Market, and one as a large grocery store. The Service calculated the Market's average transaction size during the review period to be $68.88.[25] The three comparable stores had average transaction sizes of $51.22, $35.05, and $28.75.[26] The average

4

transaction in a medium grocery store in Pennsylvania is $19.58.[27] In Philadelphia County, the average transaction amount in a medium grocery store is $20.54.[28]

The Service finally analyzed EBT data from six households which shopped at the Market.[29] The Service found all the households also shopped at other medium grocery stores, supermarkets, and superstores. For example, one household completed six transactions at four different grocery stores within a week of shopping at the Market.[30] The stores included Acme Markets and Walmart. The six transactions amounted to $148. The next day, the same household used $209.86 worth of SNAP benefits at the Market.[31] The Service found it highly unlikely the household would legitimately spend a high dollar amount at the Market after recently making numerous purchases at other grocery stores, especially because the Market stocks so few high priced items.[32] The Service found the Market's product offerings would not compel a household to spend high dollar amounts while simultaneously shopping at other medium grocery stores, superstores, and supermarkets.

After completing its case analysis, the Service formally charged the Market with trafficking SNAP benefits.[33] The Service's charge letter attached a list of ninety-six repetitive transactions and 400 high dollar transactions.[34]

### *The Market responds to the Service's charge letter.*

The Market's President Hussain Laskar responded to the Service's charge letter.[35] Mr. Laskar explained the Market provided specialty South Asian and Halal food products not found in traditional grocery stores in the area.[36] In an attempt to justify the repetitive transactions identified in the charge letter, Mr. Laskar explained several customers placed orders by telephone and he charged the customers when they arrived to pick up their order.[37] But when the customers arrived to pick up the phone order, the customers realized they forgot to order certain

5

items by telephone, and made a second purchase.[38] Mr. Laskar also explained it is normal for a customer to return to a grocery store upon forgetting an item or realizing a certain item is on sale.[39]

To justify the high dollar transactions, Mr. Laskar explained many items in the Market are expensive and sold by the pound.[40] He explained customers from South Asia purchase large quantities of food at a time, frequently for weeks at a time.[41] Mr. Laskar noted several of his customers travel from out-of-state so they purchase food products for an entire month.[42] Mr. Laskar asserted some customers buy whole goats at the Market priced at $250.[43] Finally, Mr. Laskar explained the Market offers discounts and sales which encourages customers to make large purchases.[44]

Mr. Laskar offered two example transactions, without supporting documentation, which he believed demonstrated how the Market's customers could make large and repetitive purchases.[45] Mr. Laskar explained a potential customer could purchase twenty pounds of boneless beef for $99, thirty-five pounds of chicken for $70, fifteen pounds of fish for $30, twenty pounds of ayer fish for $120, biscuits for $10, and a box of tea for $18 totaling $347. The second example transaction listed five bags of rice for $125, and six boxes of "sweets" for $36, totaling $161. The two transactions together total $508. Mr. Laskar described these example transactions as "typical" for the Market's customer base.

### *The Service permanently disqualifies the Market as an authorized SNAP retailer and the Administrative Review Officer affirms the Service's decision.*

After reviewing the Market's response to its charge letter, the Service permanently disqualified the Market as an authorized SNAP retailer.[46]

The Market requested administrative review of the Service's determination to permanently disqualify it as a SNAP retailer.[47] The Market attached documents: invoices from

6

its suppliers, an inventory list including sale price and markup percentages, approximately 125 sales receipts, photographs of the store's inventory, promotional flyers, and fourteen form affidavits from Market customers.[48] The form affidavits provided a space for the customer to list the food products the customer typically purchased from the Market, the frequency of the purchases at the Market, the dollar amount of "large purchases" the customer makes at the Market, and finally an estimated percentage of monthly SNAP benefits the customer spends at the Market.[49] Of the 125 receipts offered by the Market, the Market itemized products purchased using a generic description, "DEPT001."[50] Only thirty-eight receipts contained at least one itemization description unique to the item purchased, such as "goat", "chicken", "fish", or "rice."[51]

After review of the materials submitted by the Market, Administrative Review Officer Robert T. Deegan affirmed the Service's decision to permanently disqualify the Market as a SNAP retailer for trafficking SNAP benefits. Officer Deegan wrote a thirty-one page opinion in support of the Service's final agency decision.

Officer Deegan summarized the investigator's findings from his visit to the Market. Officer Deegan then reviewed the transactions at issue. Officer Deegan first addressed the forty-seven sets of transactions the Service identified as "rapid and repetitive." Officer Deegan described the second transactions in these sets as "substantial" and in fifty-five percent of the transactions they exceeded the first transaction.[52] Officer Deegan also noted the time between transactions varied between fifty-six seconds and twenty-four hours.[53] Fourteen sets of transactions occurred within four minutes.[54] Officer Deegan explained processing repetitive transactions in a short period of time is a common method SNAP retailers use to avoid high dollar transactions which the store's inventory cannot justify.[55] SNAP retailers split the

7

transaction in an attempt to hide trafficking violations.[56]   Officer Deegan described the transaction sets at issue "to be in amounts which are indicative of trafficking."[57]

The Market once again argued the repetitive transactions could be explained by customers placing telephone orders then later making a second purchase when realizing they forgot certain items in their initial order. Officer Deegan rejected this argument because the Market failed to adduce evidence it accepted telephone orders and the offered reason did not credibly explain the large second transactions within a short period of time.[58]

Officer Deegan made clear the repetitive transactions alone did not warrant permanent disqualification. Rather, the fact the investigator reported and documented a "minimal quantity and variety of staple foods" combined with the repetitive and large transactions made the EBT transactions at the Market suspicious.[59]   Officer Deegan also discounted the Market's claim customers forgot certain items after their first transaction because more than half of the repetitive transactions exceeded the total value of the initial purchase and over sixty percent of the transactions exceeded $200, far greater than the average medium grocery store SNAP transaction.[60]   Officer Deegan concluded it is more likely the repetitive and high dollar transactions "were contrived by store employees trying to obscure trafficking."[61]

Officer Deegan also questioned the ability of the cashier at the Market to process the repetitive transactions in such quick succession because the Market cashier space had limited counter space, no optical scanner to scan food items requiring the cashier manually itemize each food product purchased, no conveyor belt for the customer to place his food items and facilitate the transaction process, and the Market did not stock many high dollar items.[62]   Officer Deegan found it improbable the repetitive transactions were legitimate eligible food purchases and the transaction pattern suggested SNAP benefit trafficking as the most likely explanation.[63]

8

Officer Deegan analyzed the EBT transaction data for nineteen of the thirty-eight households which made repetitive transactions. Officer Deegan found the majority of these households shopped at other comparable or larger grocery stores within a mile of the Market which carried Halal food products and in quantities larger than those offered at the Market.[64] All but one of the households also shopped at superstores, such as Walmart or Target.[65] Officer Deegan also explained these same households did not make the same repetitive transactions resulting in high dollar amounts at other SNAP retailers. Only three of the nineteen households "displayed remotely similar patterns" but the households' repetitive transactions amounted to less than $125 per set, far less than the total dollar amount of the transaction sets processed at the Market.[66]

Officer Deegan concluded, "Common sense dictates that it is improbable that SNAP households, with limited cash resources, would choose to shop at the [Market] when their SNAP eligible food needs could be met at any of the comparably sized or larger ethnic or non-ethnic stores they are already regularly shopping at and therefore it is more likely than not that these households were trafficking SNAP benefits at the [Market] and that the multiple transactions were attempts by store employees to obscure trafficking by dividing a high dollar value transaction into a series of smaller dollar value transactions. This is a method used by stores to avoid high dollar transactions that cannot be supported."[67]

With respect to the 400 high dollar transactions, Officer Deegan found the reason for the transactions is more likely than not SNAP benefit trafficking. Officer Deegan first observed the households completed high dollar transactions at the Market despite shopping at other larger and better stocked stores within twenty four to forty-eight hours.[68] Officer Deegan noted the Market processed over two times less SNAP transactions than the average medium grocery store in

9

Philadelphia County, but its average SNAP transaction was 240 percent larger than the average SNAP transaction at a medium grocery store in Philadelphia County.[69] The Market's average SNAP transactions were up to eighty percent higher than comparable nearby medium grocery stores which sold Asian and Halal food offerings.[70]

The Market argued the Service inaccurately calculated the square footage of the store and misclassified the store as a medium grocery store. The Market argued if the Service classified it as a supermarket, it would not have investigated into the transactions at issue. Officer Deegan acknowledged if the Service classified it as a supermarket, it would likely not been under investigation. But Officer Deegan explained the square footage of a store is not the deciding factor in categorizing a store. The Service considers other factors such as sales volume, product offerings, and inventory depth. Relying on the information provided by the investigator regarding the Market's inventory and offerings, Officer Deegan confirmed the Market is appropriately categorized as a medium grocery store.

Officer Deegan first noted eighty-five percent of the 141 unique households identified in the 400 high dollar transaction list made food purchases at superstores, supermarkets, or large grocery stores within twenty-four hours of shopping at the Market.[71] Officer Deegan identified nineteen households which made purchases of $350 dollars or more at the Market and found these same households made on average two transactions per month to the Market and on average forty-three transactions at other SNAP retailers during the review period, an average of seven transactions per month.[72] Officer Deegan found this statistic to directly contradict the Market's claim its customers relied solely on the Market to make bulk purchases for weeks at a time.[73]

10

Officer Deegan discounted the Market's argument its high dollar transactions resulted from out-of-state customers shopping at the Market buying weeks of groceries at a time. Officer Deegan found only twenty-two transactions from the review period at the Market came from out-of-state customers.[74] The transactions accounted for just over one percent of the Market's SNAP transactions.[75] The average out-of-state customer spent $73.21 at the Market.[76]

Officer Deegan found the Market's high average transaction amount could not be justified by the Market's sale of whole goats.[77] Officer Deegan observed the investigator's photographs did not show the Market stored whole goats in its freezers and the Market did not adduce signage or promotions which advertised the sale of whole goats.[78] Officer Deegan also reviewed invoices from the Market's suppliers.[79] Only two of the Halal meat suppliers itemized their invoices and the itemized invoices only accounted for the Market buying four whole goats during the review period.[80] While Officer Deegan acknowledged the non-itemized invoices could include whole goat purchases, he found the possibility unlikely because the lack of evidence whole goat purchases accounted for a significant portion of the Market's sales.[81]

Officer Deegan reviewed photographs submitted by the Market of its store layout and inventory.[82] The photos submitted by the Market show a fuller stock of inventory than the photos taken by the investigators.[83] But Officer Deegan observed one photo submitted by the Market of its exterior showed a sign on the front entrance promoting the Market's grand opening. The Market opened in 2012, four years before the investigator took his photographs. Officer Deegan called into question the reliability of the Market's photos because he believed the photos represented the store's inventory at the time of its grand opening, not during the review period.[84] Officer Deegan found the substantial difference in inventory in the Market's photos and the

11

investigator's photos could only be explained by the Market staging its photos or submitting photos which did not accurately represent its offerings during the review period.[85]

Officer Deegan reviewed the Market's "typical" transaction examples. Officer Deegan found it unlikely the typical Market customer would purchase food in such large quantities because the customers' SNAP data showed the customers shopped extensively at other grocery stores and superstores.[86] Officer Deegan specifically challenged the Market's "typical" transaction of a customer purchasing five bags of rice at \$25 each.[87] First, Officer Deegan noted the Market's offered inventory and price list did not include a bag of rice priced at \$25.[88] Second, Officer Deegan found it unlikely a household would purchase five large bags of rice at a time.[89]

Officer Deegan analyzed the Market's offered chart outlining its inventory, purchase prices, sale prices, and markups.[90] Officer Deegan noted the highest priced products included a thirty-two pound bundle of canola oil listed at \$24.99 and a fifty-six ounce container of powdered milk listed at \$29.99.[91] Officer Deegan noted the investigator's photographs showed the containers of powdered milk, but showed canola oil sold only in one gallon or smaller containers.[92] The Market's inventory listed included an extensive list of specialty fish.[93] But the investigator's photographs of the meat storage rooms of the Market did not demonstrate a notable variety of fish offerings.[94] Officer Deegan concluded these discrepancies called into question the accuracy of the inventory list and the inventory list did not justify the high dollar transactions taking place at the Market.[95]

Officer Deegan reviewed the 125 customer receipts submitted by the Market.[96] Officer Deegan noted only six of the receipts accounted for the ninety-six repetitive transactions at issue. Officer Deegan also observed a few receipts included a sales tax amount, suggesting the Market

12

committed a violation of SNAP regulations by allowing a customer to purchase ineligible food items using SNAP benefits or to use SNAP benefits to pay sales tax.[97] Officer Deegan explained the receipts including sales tax "cast[s] doubt on the integrity of the business operations as well as on the quality of employee training."[98] Officer Deegan also noted most of the receipts did not identify the product purchased.[99] Officer Deegan concluded the receipts did not confirm trafficking but also did not provide a viable explanation for the transactions at issue.[100]

Officer Deegan analyzed the fourteen customer affidavits submitted by the Market.[101] Officer Deegan discovered a few of the customer names did not match the household accounts listed as making SNAP purchases during the review period.[102] The EBT data of the customers showed on average the customers made fifteen transactions at the Market during the review period and on average sixty-six transactions at other grocery stores during the review period.[103] The EBT data also confirmed most of the customers "grossly inflated" their maximum transaction amounts and percentage of SNAP benefit usage at the Market in their affidavits.[104]

Officer Deegan concluded the Market's inventory did not support the high dollar transactions taking place. Officer Deegan noted the investigator took the photos of the Market's inventory during the monthly SNAP issuing cycle, meaning SNAP households recently received their monthly benefits.[105] Stores know SNAP households typically make purchases immediately after receiving their monthly benefits and stock their shelves accordingly.[106] Even during the SNAP issuing cycle, the Market did not stock many products, calling into question a typical customer's ability to make bulk purchases for weeks at a time.[107]

Officer Deegan also observed SNAP redemptions at the Market dropped twenty-two percent and total SNAP transactions dropped nearly twenty percent after the Market's receipt of the Service's charge letter.[108] Officer Deegan concluded these statistics provide a "clear

13

indication of trafficking" because if trafficking did not occur at the Market, there is no reason for the sharp decline in SNAP usage immediately after receiving a charge letter.[109]

After thorough review of the record, Officer Deegan concluded the empirical data and the absence of sufficient evidence for the legitimacy of the transaction patterns at issue demonstrated it is more likely than not trafficking is the reason for the "unusual, irregular, and inexplicable" transactions.[110] Officer Deegan affirmed the Service's decision to permanently disqualify the Market as an authorized SNAP retailer.[111]

## II.  Analysis

The Market, Mr. Laskar, and Mostofa Badol now sue the United States seeking judicial review of the Service's final agency decision to permanently disqualify the Market as an authorized SNAP retailer.[112] They allege the United States denied them equal protection of law by selectively enforcing SNAP regulations against them. They argue the United States targets privately owned grocery stores and ignores SNAP regulation violations by publically traded grocery stores. Both the United States and the Market move for summary judgment.[113]

The United States argues the summary judgment record supports Officer Deegan's conclusion the Market trafficked SNAP benefits and to permanently disqualify the Market from SNAP. The United States relies on statistics of SNAP benefits usage at the Market collected through the EBT system and comparisons to similarly situated stores which also accept SNAP benefits. The United States offers statistics claiming they show unusually high dollar transaction amounts in SNAP benefits and frequent SNAP benefit transactions by the same household account. The United States argues these statistics can only be the result of SNAP benefit trafficking. The United States argues the Market, Mr. Laskar, and Mr. Badol's equal protection claim fails because they cannot demonstrate the United States treated them differently from

14

similarly situated stores and the alleged selective enforcement is not based on an arbitrary classification.

The Market argues the United States' statistics are insufficient to establish it trafficked SNAP benefits. The Market offers alternative explanations for the high dollar transactions and frequent SNAP purchases by the same household. The Market argues it offers specialty Halal and Asian food and their typical product costs more than the average product in a non-international grocery store. It also argues certain products are bought in large quantities such as a whole goat purchased at $250 and bags of rice sold at $25 each. The Market argues the frequent SNAP transactions from the same household card is typical of customers who rely on medium grocery stores and the EBT data of household accounts cited by the United States confirms the households make the same frequent purchases at other medium grocery stores.

Mr. Laskar and Mr. Badol did not oppose the United States' motion for summary judgment and did not move for summary judgment.

## A. We grant the United States' motion for summary judgment because the Market failed to create a genuine dispute of material fact the irregular EBT data evidenced SNAP benefit trafficking.

A retailer may challenge the Service's final agency decision to permanently disqualify it from SNAP by filing a complaint against the United States in district court.[114] Our review of the Service's decision to permanently disqualify the Market is *de novo*.[115] We are required to "examine the entire range of issues raised and not merely to determine whether the administrative findings of the agency are supported by substantial evidence."[116] *De novo* review "is compatible with a summary judgment disposition if there are no material facts in dispute."[117] We are not limited to the administrative record and the Market may offer any relevant evidence available to support its case.[118]

15

We need to make two findings. First, we must determine whether a SNAP violation occurred. The Service charged the Market with SNAP benefit trafficking. At trial, the Market bears the burden to prove by the preponderance of the evidence SNAP trafficking did not occur.[119] Second, we must determine whether the Service acted arbitrarily or capriciously in permanent disqualification. At trial, the Market bears the burden to prove by the preponderance of the evidence the Service's determination to permanently disqualify the Market is unwarranted in law or fact.[120]

The Service may find a store committed a SNAP violation and disqualify it based on facts established through "on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system."[121] The Service may disqualify a store if it finds the store committed just one act of SNAP benefit trafficking.[122] Trafficking includes "the buying, selling, stealing, or otherwise effect[ing] an exchange of SNAP benefits . . . for cash or consideration other than eligible food either directly, indirectly, in complicity or collusion with others, or acting alone."[123] Trafficking also includes "purchasing a product with SNAP benefits with the intent of obtaining cash or consideration other than eligible food by reselling the product."[124]

The United States need not adduce evidence it caught the Market "red-handed" engaging in SNAP benefit trafficking.[125] At summary judgment, the United States may satisfy its burden of demonstrating the absence of a genuine issue of material fact based on irregular EBT transaction data and other evidence.[126] But summary judgment for the United States is not automatic based on transaction data. For example, courts deny summary judgment where the United States fails to compare the EBT data it characterizes as irregular to comparable SNAP retailers' EBT data or in the absence of other compelling circumstances.[127] The Market may

refute the United States' statistics and data to create a genuine issue of material fact by offering an explanation supported by evidence the irregular EBT data is not the result of trafficking. But the Market may not rely on generalized or conclusory arguments to create genuine issues of material fact.[128]

## 1. The United States satisfied its burden of showing the absence of a genuine dispute of material fact the Market committed a SNAP violation.

The United States argues the Market trafficked SNAP benefits. The United States does not adduce direct evidence of trafficking. Rather, it asks we find it is more likely than not trafficking occurred based on the pattern of SNAP benefit usage at the Market compared to similar SNAP retailers. The United States argues the only explanation for the difference in SNAP benefit usage at the Market compared to similar stores is SNAP benefit trafficking. Specifically, the United States identifies two patterns of transactions which evidence the Market trafficked SNAP benefits. First, the Market processed repetitive transactions from the same household account in a short period of time. Second, the Market processed high dollar transactions.

### a. Repetitive transactions at the Market by the same household account evidence SNAP benefit trafficking.

The United States argues the high volume or repetitive transactions by the same household account within twenty-four hours at the Market evidences SNAP benefit trafficking. The Market argues its customers' purchasing habits are typical for medium grocery stores and the United States' statistics do not indicate trafficking. The Market argues the United States' statistical and comparison analysis is flawed. The Market challenges the comparison stores selected by the Service because one of the stores is a large grocery store while the Market is a medium grocery store. The Market argues the comparison stores identified by the United States

17

had similar amounts of or more repetitive transactions than it processed during the review period. The Market argues its customers return to make frequent purchases because it remains open longer than the comparison stores. Finally, the Market argues several households highlighted by the United States made similar repetitive transactions at other SNAP retailers.

In *Altawel v. United States*, the court denied the United States' motion for summary judgment because it found the United States' statistical analysis of the EBT data insufficient to establish the absence of a genuine issue of material fact whether the transactions at issue evidenced trafficking.[129] The court explained while the United States may rely on irregular EBT data to evidence trafficking, courts around the country have granted summary judgment based on irregular EBT data when the data is compared to the EBT data of similar SNAP retailers.[130]

We do not face the same issue highlighted in *Altawel*. In its investigation and at the administrative level, the Service compared the Market's EBT data to similar stores. Based on the comparison, the Service decided to charge the Market with trafficking. Relying in part on the Service's comparison analysis, Officer Deegan concluded the irregular EBT data evidenced SNAP benefit trafficking.

Although we do not face the *Altawel* dilemma, the Market challenges the United States' comparison analysis because one of the comparison stores is a "large grocery store" where the Market is a "medium grocery store." The Market's argument is meritless as it fails to identify how the exclusion of the large grocery store would have changed the data analysis. Two of the three comparison stores are medium grocery stores. Even when the Market's EBT data is compared to only the medium comparison stores, the Market's data is abnormal. The Market also argues the Service erred by comparing the Market's average transaction amount to the average transaction cost of medium grocery stores in Philadelphia County. The Market states the

18

Service used the county average transaction because the state average is higher and the "local medium grocery transaction" is even higher than the state average. The Philadelphia County medium grocery store average transaction amount is $19.58.[131] The Commonwealth medium grocery store average transaction amount is $20.54.[132] The ninety-six cents difference between the two averages is negligible considering the Market's average transaction is nearly $50 higher than both averages. The Market also never identifies what the average transaction amount is for the "local medium grocery store" and does not define how "local" differs from Philadelphia County in geographic scope.

The Market argues one of the comparison stores used by the United States in its statistical analysis processed more than forty more repetitive transactions during the review period. The Market argues this shows customers who shop at medium grocery stores do so more frequently and negates an inference of trafficking. The Market is correct in citing the fact one medium comparison store did process forty more transactions the United States classified as repetitive during the review period.[133] But the Market failed to account for the fact the comparison store processed nearly 3,500 more transactions than it during the review period.[134] The Market processed 1,823 SNAP transactions while the comparison store processed 5,307 SNAP transactions.[135] The remaining two comparison stores had fewer repetitive transactions than the Market despite processing 10,218 and 1,806 more SNAP transactions during the review period.[136] While the Market correctly argues a comparison store processed forty more repetitive transactions than the Market did during the review period, when the data point is read in context with the entire data set, it losses its persuasive effect.

The Market's bald argument it processed more repetitive transactions because it remained open longer than the comparison stores fails. The Market does not adduce evidence its

customers shopped more frequently at the Market because of its store hours. For example, the Market's customers do not cite store hours as a reason for making large or frequent transactions in their affidavits.[137] In *Hajifarah v. United States*, the court found the Service's correctly decided to permanently disqualify the store for SNAP benefit trafficking.[138] The plaintiff called numerous customers to testify they never exchanged SNAP benefits for cash at the store.[139] Critically, the court emphasized the witnesses could not provide detail on or refute any of their transactions at issue.[140] The court also highlighted the fact the customers could not corroborate or provide details which aligned with the store owner's explanation for the transactions.[141] As in *Hajifarah*, the Market adduced general form statements from fourteen customers stating they did not exchange SNAP benefits for cash. However, none of the customers provide detail beyond general descriptors of their purchases, such as "fish", "rice", or "goat." Also as in *Hajifarah*, the customers do not refute or provide detail on specific purchases at issue and do not provide detail corroborating the Market's belief customers made repetitive transactions because the Market's store hours. Without supporting evidence, the Market's conclusory and generalized assertion does not create a genuine issue of material fact.[142]

Finally, the Market cites a single transaction set from one of six households highlighted in the Service's case analysis document. The Market argues this transaction and other repetitive purchases by the six households at different stores evidences customers who shop at medium grocery stores routinely make repetitive purchases and does not evidence trafficking. The Market cites to two transactions within an hour of each other where the household spent $85.98 in the first transaction and $43.56 in the second transaction. Notably, these transactions occurred at different stores. As Officer Deegan explained, repetitive transactions are used by violating stores to avoid single high dollar transactions which the store's inventory does not support.[143]

The fact the transactions cited by the Market did not occur at the same store discounts the example. Further, the Market's citation to a single transaction hardly comes close to offering an adequate explanation to create a genuine issue of material fact the irregular EBT data pattern of 1,800 transactions over a six month period is not the result of trafficking.

Upon review of the six household's EBT data highlighted by the Service in its case analysis document, there are several examples of repetitive purchases at the same store within a twenty-four hour period. Curiously, the repetitive transactions at the Market differ in amount from the repetitive transactions at other stores. Out of thirteen total repetitive transactions at the same store within a twenty-four hour period, seven occurred at the Market and the remaining six occurred at four different stores.[144] The average first and second transaction amounts at the Market is $66.34 and $120.38 respectively. The average first and second transaction amounts at the different stores is $9.40 and $9.02 respectively.

The fact the second transaction for each set processed at the Market are large transactions, while the same household's subsequent purchases at different stores are for lesser or insubstantial amounts, further supports our conclusion the Market failed to create a genuine issue of material fact based upon the data of the six households highlighted by the Service. For example, in *Onukwugha v. United States*, the court distinguished between repetitive transactions when the second transaction involves large or identical purchase amounts from second transactions involving small purchase amounts.[145] The court discounted the persuasiveness of repetitive transactions where the second transaction involved a small dollar amount.[146] The court found these transactions evidenced a customer forgetting to purchase a certain product and doing so immediately after realizing he forgot the product.[147] But the court described transactions occurring in quick succession involving large and identical amounts as "extremely

21

suspicious."[148]  Absent an explanation from the store owner or customers, the court found the plaintiff failed to meet his burden to prove the repetitive transactions involving high dollar amounts were not the result of trafficking.[149]

The six repetitive purchases at stores other than the Market provide for a reasonable inference the customer forgot a particular item after the initial transaction and later purchased the forgotten item.  The second purchases are on average less than the initial transaction and are of an insubstantial amount suggesting a customer forgot a select few items in their initial transaction.  The data of repetitive purchases made by the same households at the Market does not provide for a reasonable inference the second transaction is the result of forgetting to purchase certain items.  The second transactions are not only of substantial value, but the average of the transactions are nearly double the size of the initial purchase.  For example, a household made a purchase for $28.15 at the Market and six minutes later made a purchase of $192.46.[150] Another household made a purchase of $17.96 at the Market and seven minutes later made a purchase of $189.52.[151]  A third household made a purchase of $87.33 at the Market and less than two minutes later made a purchase of $150.04.[152]  Even if we were to disregard the size of the second transaction in relation to the first, the high dollar amount of the second purchases alone cannot support an inference the customer purchased forgotten items.

The Market does not cite other repetitive transaction sets which refute the data of the households identified by the Service.  But reviewing the entire repetitive transaction data set attached to the Service's charge letter sent to the Market, only fourteen of the forty-seven transaction sets have a second purchase of less than $50.[153]  Twenty-one of the second transactions totaled over $100.[154]  The lowest second purchase in the transaction sets is $20.[155] The Market adduced only six receipts for the repetitive transactions in question.[156]  Of those six

22

receipts, only two contain a specific item description of only one of the products purchased, the rest are itemized under a generic itemization code.[157] The Market does not provide an adequate explanation for these transactions and does not identify a genuine dispute of material fact.

In *Skyson USA, LLC v. United States*, the United States Magistrate Judge assessed whether repetitive transactions of $79.99 by the same household account evidenced SNAP benefit trafficking. The court denied the United States' motion for summary judgment finding the repetitive transactions at issue could reasonably be explained by the store's customer returning to purchase a specific case of corned beef.[158] The court speculated the customer may have been limited in his ability to carry the corned beef case, and as a result, made multiple trips to the store to purchase multiple cases of the corned beef.[159]

Our case is different from *Skyson*. Here, the second transactions at issue range in value. Further, unlike in *Skyson*, the Market does not cite and we cannot identify a specific product the customers purchased which could provide a reasonable explanation for the repetitive transactions. Also, the scenario speculated by the court in *Skyson* of a customer returning to purchase a single product is more plausible than the high dollar and multi-product repetitive purchases we face. The Market also failed to adduce evidence of customers returning in short time periods due to carrying limitations. Finally, in *Skyson*, the court analyzed three purchases from one unique customer over an eleven hour period.[160] We are reviewing forty-seven repetitive transaction sets from thirty-eight unique households separated by as little as fifty-six seconds. We cannot so easily explain these transactions as the court did in *Skyson*. The Market has failed to adduce evidence these pervasive and seemingly randomly valued repetitive transactions are not the result of trafficking.

Finally, without a large counter space, conveyor belt for customers to place items, an optical scanner to scan products into the cash register system, and bagging area and with only one cash register, it is highly unlikely the Market would be able to process not only transactions in quick succession but transactions in quick succession of high dollar amounts.[161]

The Market's factually unsupported arguments fail to create a general dispute of material fact the irregular EBT data adduced by the United States is not the result of trafficking.

### b. Irregular high dollar transactions at the Market evidence SNAP benefit trafficking.

The United States argues an unusual amount of high dollar transactions at the Market evidence the Market trafficked SNAP benefits. The Market argues "some combination" of its variety of food offerings, well-stocked inventory, specialty international food offerings, and pricing "seems to be sufficient" to explain the 400 large transactions at issue. The Market cites the investigator's report to argue it is well stocked in specialty items. The Market argues the comparison stores carry roughly the same variety of staple foods as it does but the Market carries the same or a greater variety of dairy and bread products as the comparison store characterized as a large grocery store. The Market argues it processes larger transactions because it is the only local store to offer both Halal and Asian food products. Finally, the Market argues its meat, fish, and rice are "driving forces" in its transaction sizes.

The Market's vague and generalized argument "some combination" of its food offering, inventory, and pricing justifies the 400 large transactions at issue is insufficient to refute the EBT data and create a genuine issue of material fact.[162] The Market's argument becomes even less persuasive considering it acknowledges the comparison stores carry roughly the same variety of products, except in dairy and bread offerings. Even assuming the Market is well-stocked and offers international foods, the Market does not adduce specific evidence addressing why its EBT

24

transaction data differs so greatly from the comparison stores when the comparison stores carry roughly the same inventory. Despite processing nearly double the amount of SNAP transactions in the review period, one comparison store processed 166 fewer high dollar transactions than the Market.[163] The other medium grocery store processed just over 400 more large transactions than the Market, but the same store processed nearly 3,500 additional transactions during the review period.[164] The comparison store also sold meat package bundles which the store promoted and sold for prices ranching from $69.99 to $279.99.[165] The investigator sent to the Market did not observe meat bundles for sale and the Market has not adduced evidence it sold similar meat bundles, which could provide a reasonable explanation for the large transactions.[166]

Review of the receipts adduced by the Market do not support its argument its meat, fish, and rice are driving forces of its large transaction sizes. The Market adduced approximately 115 receipts it claims account for the 400 large transactions, but only thirty-two contain at least one itemization for meat, fish, or rice.[167] The rest contain single or numerous line items all filled out with a generic itemization code, precluding any chance to know what the customer actually purchased.

The Market's argument it processed a high volume of large transactions because it offered both Halal and Asian food products is without citation to the record and speculative at best. Even the Market's customers do not acknowledge in their affidavits they made large purchases at the store because it offered both Halal and Asian food.

Finally, the Market failed to refute Officer Deegan's finding its SNAP redemptions decreased by twenty-two percent the month after it received the Service's charge letter. A significant drop in SNAP redemption after receiving a charge letter allows for a reasonable inference the decrease in redemptions is the result of the Market ceasing its trafficking

activity.[168] If customers made purchases without trafficking SNAP benefits before the Service charged the Market with trafficking, there would be no reason for the significant decline in SNAP redemptions immediately after the Market received the charge letter.

The Market's factually unsupported arguments fail to create a general dispute of material fact the irregular EBT data adduced by the United States is not the result of trafficking.

### 2. The Service did not arbitrarily or capriciously permanently disqualify the Market.

The Market does not argue whether the Service acted arbitrarily or capriciously in permanently disqualifying the Market as a SNAP retailer. The administrative record and adduced evidence support the Service's decision and the Service did not act arbitrarily or capriciously in permanently disqualifying the Market.

A SNAP retailer shall be permanently disqualified after the first occasion of SNAP benefit trafficking.[169] The SNAP regulations provide for a civil monetary penalty in place of permanent disqualification, but it is only available for stores which had an effective policy in place to prevent SNAP violations and the store owner did not know of, did not approve of, did not benefit from, and had no involvement in the trafficking.[170] To qualify for the civil monetary penalty, the Service's implementing regulations further require a store to submit "substantial evidence" demonstrating the store implemented an effective SNAP compliance policy, the store established the compliance policy before the violations took place, the store developed and implemented an effective personnel training program, and the store owner did not know of, did not approve of, did not benefit from, and had no involvement in the trafficking.[171]

The Market's irregular EBT transaction data during the review period satisfies the United States' burden of showing an absence of genuine issue of material fact. The Market failed to adduce evidence to explain why the irregular EBT data is not the result of trafficking. The

26

Market does not argue it qualified for a civil monetary penalty in place of permanent disqualification. The record does not support a finding the Market qualifies for the monetary penalty as the Market did not adduce evidence it had an effective compliance policy and effective personnel training program in place to prevent SNAP violations. Absent evidence or argument from the Market showing it is entitled to a civil monetary penalty in place of permanent disqualification, we find the Service appropriately permanently disqualified the Market as a SNAP retailer.

We grant the United States' motion for summary judgment. The Service's did not act arbitrarily or capriciously by permanently disqualifying the Market as an authorized SNAP retailer. The Market failed to create a genuine dispute of material fact the irregular EBT transaction data is not the result of SNAP benefit trafficking.

### B. We grant summary judgment on the Market, Mr. Laskar, and Mr. Badol's equal protection claim because they failed to adduce evidence of a similarly situated entity treated differently based on an arbitrary factor.

The Market, Mr. Laskar, and Mr. Badol argue the United States' selective enforcement of SNAP regulations against privately owned stores violates of the Fifth Amendment's equal protection clause.[172] They allege the United States only charged privately owned stores with SNAP benefit trafficking while intentionally choosing not to enforce the same regulations against publically traded stores. Mr. Laskar and Mr. Badol do not oppose the United States' motion for summary judgment. Although the Market opposed the United States' motion for summary judgment on its claim for judicial review, it did not oppose the United States' motion for summary judgment on its equal protection claim.

Although the Fifth Amendment does not contain an Equal Protection Clause, the United States Supreme Court has construed the Fifth Amendment to contain an equal protection

guarantee.[173] Fifth Amendment equal protection claims are analyzed under the same framework as equal protection claims arising under the Fourteenth Amendment.[174] The Equal Protection Clause prohibits selective enforcement of law based on an unjustifiable standard.[175] To establish a selective enforcement claim, the Market must establish (1) the United States treated it differently from similar situated entities and (2) "this selective enforcement was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor . . . or to prevent the exercise of a fundamental right."[176] The claim also requires "an element of intentional or purposeful discrimination."[177] Entities are similarly situated when they are alike "in all relevant aspects."[178]

The Market, Mr. Laskar, and Mr. Badol's failure to oppose the United States' motion for summary judgment alone is grounds to dismiss the claim. On the merits, the Market, Mr. Laskar, and Mr. Badol do not identify a similarly situated entity which the United States treated differently based upon the classification of privately owned versus publically traded. They did supplement the record including deposition testimony from a different case of Douglas Wilson, a program analyst and ALERT program manager for the United States. Mr. Wilson testified the ALERT system does not flag superstores or supermarkets for potential SNAP violations because superstores and supermarkets maintain their own fraud detection systems.[179]

The Market, Mr. Laskar, and Mr. Badol fail to identify how the Market, a single store which offers Halal and Asian food products, is similarly situated to a superstore, such as Walmart or Target, or a supermarket. The Market argued in its opposition to the United States' motion with respect to its claim for judicial review it is not comparable to a "large grocery store", which the Service used as a comparison store. The Market cannot have it both ways. It cannot fault the Service for comparing the Market to a large grocery store, yet seek to compare

28

itself to a supermarket or superstore for purposes of establishing an equal protection claim. We grant the United States' unopposed motion for summary judgment on the equal protection claim.

## III. Conclusion

In the accompanying Order, we grant the United States' motion for summary judgment and deny the Market's motion for summary judgment. The United States adduced irregular EBT transaction data evidencing SNAP benefit trafficking. The Market failed to create a genuine dispute of material fact by asserting unsupported or generalized arguments. We also dismiss the Market's equal protection claim because it failed to adduce evidence of a similarly situated store which the United States treated differently based on an arbitrary factor.

---

[1] Our Policies require a Statement of Undisputed Material Facts in support of a Rule 56 motion. Where the parties cross move for summary judgment, our Policies require the parties submit a joint appendix of consecutively Bates stamped exhibits. The United States and the Market cross move for summary judgment. The United States filed a Statement of Undisputed Material Facts at ECF Doc. No. 19 ("United States SUMF"). The Market responded to the United States SUMF at ECF Doc. No. 21 and submitted additional Statements of Undisputed Material Facts at ECF Doc. No. 22 ("Market SUMF"). The United States responded to the Market SUMF at ECF Doc. No. 25. The parties submitted a joint appendix at ECF Doc. No. 18-4 through 18-42. References to the Joint Appendix shall be by Bates number, for example "J.A. 1."

[2] United States SUMF at ¶¶ 1-2.

[3] United States SUMF at ¶ 4.

[4] United States SUMF at ¶¶ 1-2.

[5] United States SUMF at ¶ 5.

[6] United States SUMF at ¶ 5.

[7] United States SUMF at ¶ 6.

[8] United States SUMF at ¶¶ 7-8.

[9] J.A. 76.

29

[10] J.A. 71.

[11] J.A. 25-27, 126-40.

[12] J.A. 26, 72, 126.

[13] J.A. 109.

[14] J.A. 150-176.

[15] J.A. 153.

[16] J.A. 153.

[17] J.A. 153.

[18] J.A. 153.

[19] J.A. 153.

[20] J.A. 153.

[21] J.A. 158.

[22] J.A. 159.

[23] J.A. 161-68.

[24] J.A. 161.

[25] J.A. 163.

[26] J.A. 166.

[27] J.A. 163.

[28] J.A. 165.

[29] J.A. 168-174.

[30] J.A. 170.

[31] J.A. 170.

[32] J.A. 170.

[33] J.A. 177-79.

[34] J.A. 180-92.

[35] J.A. 201-06.

[36] J.A. 201-06.

[37] J.A. 201-06.

[38] J.A. 201-06.

[39] J.A. 201-06.

[40] J.A. 201-06.

[41] J.A. 201-06.

[42] J.A. 201-06.

[43] J.A. 201-06.

[44] J.A. 201-06.

[45] J.A. 201-06.

[46] J.A. 299-300.

[47] J.A. 308.

[48] J.A. 330-510.

[49] J.A. 496-510.

[50] J.A. 422-46.

[51] J.A. 422-46.

[52] J.A. 584.

[53] J.A. 584.

[54] J.A. 584.

[55] J.A. 584.

[56] J.A. 584.

[57] J.A. 584.

[58] J.A. 585.

[59] J.A. 585.

[60] J.A. 585.

[61] J.A. 585.

[62] J.A. 587.

[63] J.A. 587.

[64] J.A. 587.

[65] J.A. 587.

[66] J.A. 588.

[67] J.A. 588.

[68] J.A. 589.

[69] J.A. 589.

[70] J.A. 589.

[71] J.A. 593.

[72] J.A. 593.

[73] J.A. 593.

[74] J.A. 594.

[75] J.A. 594.

[76] J.A. 594.

[77] J.A. 595.

[78] J.A. 595.

[79] J.A. 595.

[80] J.A. 595.

[81] J.A. 595.

[82] J.A. 595.

[83] J.A. 595.

[84] J.A. 595.

[85] J.A. 596.

[86] J.A. 596.

[87] J.A. 596.

[88] J.A. 596.

[89] J.A. 596.

[90] J.A. 597.

[91] J.A. 597.

[92] J.A. 597.

[93] J.A. 597.

[94] J.A. 597.

[95] J.A. 597.

[96] J.A. 597.

[97] J.A. 597-98.

[98] J.A. 598.

[99] J.A. 598.

[100] J.A. 598.

[101] J.A. 599.

[102] J.A. 599.

[103] J.A. 599.

[104] J.A. 599.

[105] J.A. 599.

[106] J.A. 599.

[107] J.A. 599.

[108] J.A. 600.

[109] J.A. 600.

[110] J.A. 601.

[111] J.A. 603-04.

[112] Mr. Badol's interest in this litigation is unclear. The Market claims Mr. Badol has no association with the store and never held an ownership interest in the Market.

[113] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson,* 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris,* 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg,* 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis,* 808 F.3d at 643 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis,* 808 F.3d at 643 (citing *Celotex Corp.,* 477 U.S. at 322-323).

34

[114] 7 U.S.C. § 2023(13).

[115] *Id.* § 2023(15).

[116] *Freedman v. United States Dep't of Agric.*, 926 F.2d 252, 261 (3d Cir. 1991).

[117] *Id.* at 261.

[118] *Shreegi v. United States*, No. 15-2232, 2018 WL 1919576, at *1 (M.D. Pa. Apr. 24, 2018) (quoting *Affum v. United States*, 566 F.3d 1150, 1160 (D.C. Cir. 2009)).

[119] *Id.* at *2 (quoting *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997)).

[120] *Id.* (citation omitted).

[121] 7 C.F.R. § 278.6(a).

[122] 7 U.S.C. § 2021(b)(3)(B).

[123] 7 C.F.R. § 271.2.

[124] *Id.*

[125] *Young Choi, Inc. v. United States*, 639 F. Supp. 2d 1169, 1178 (D. Haw. May 28, 2009).

[126] *See Idias v. United States*, 359 F.3d 695, 698-99 (4th Cir. 2004); *Justo R. Duchimaza & Cecilia's Mkt., LLC v. United States*, 211 F. Supp. 3d 421, 433 (D. Conn. Sept. 30, 2016).

[127] *See Altawel v. United States*, No. 12-6708, 2014 WL 7272967, at *4 (W.D.N.Y. Dec. 18, 2014) vacated on other grounds 2015 WL 10013741 (W.D.N.Y. Sept. 17, 2015).

[128] *See Young Choi, Inc.*, 639 F. Supp. 2d at 1178.

[129] No. 12-6708, 2014 WL 7272967, at *4 (W.D.N.Y. Dec. 18, 2014), vacated on other grounds 2015 WL 10013741 (W.D.N.Y. Sept. 17, 2015).

[130] *Id.*

[131] J.A. 163.

[132] J.A. 165.

[133] J.A. 109.

[134] J.A. 109.

[135] J.A. 109.

[136] J.A. 109.

[137] J.A. 496-510.

[138] 779 F. Supp. 2d 191 (D. Me. Apr. 27, 2011).

[139] *Id.* at 202.

[140] *Id.*

[141] *Id.* at 206.

[142] *See Young Choi, Inc.*, 639 F. Supp. 2d at 1178.

[143] J.A. 584.

[144] J.A. 169-74.

[145] No. 11-907, 2013 WL 1620247, at *7-8 (E.D. Wis. Apr. 12, 2013). The court decided *Onukwugha* after trial and post-trial briefing. Neither party moved for summary judgment. Despite the difference in procedural posture, the court's distinction in repetitive transactions is still appropriate to consider in determining whether the Market created a dispute of material fact.

[146] *Id.* at *7.

[147] *Id.* at *7.

[148] *Id.* at *8.

[149] *Id.* at *8.

[150] J.A. 172.

[151] J.A. 173.

[152] J.A. 174.

[153] J.A. 180-85.

[154] J.A. 180-85.

[155] J.A. 180-85.

[156] J.A. 422-46.

[157] J.A. 424, 430.

[158] *Skyson USA, LLC v. United States*, No. 09-00278, 2010 WL 651032, at *9-11 (D. Haw. Feb. 22, 2010).

[159] *Id.* at *10.

[160] *Id.*

[161] *See Nadia Int'l Mkt. v. United States*, No. 14-82, 2015 WL 7854290, at *7 (D. Vt. Dec. 2, 2015), *aff'd* 689 F. App'x 30 (2d Cir. Apr. 26, 2017).

[162] *See Young Choi, Inc.*, 639 F. Supp. 2d at 1178.

[163] J.A. 109.

[164] J.A. 109.

[165] J.A. 166.

[166] J.A. 71.

[167] J.A. 422-46.

[168] *Onukwugha*, 2013 WL 1620247, at *9.

[169] 7 U.S.C. 2021(b)(3)(B).

[170] 7 U.S.C. 2021(b)(3)(B)(i)-(ii).

[171] 7 C.F.R. § 276.1(i).

[172] ECF Doc. No. 1 at ¶¶ 36-53.

[173] *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 316-17 (3d Cir. 2001) (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991)).

[174] *Id.* (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995)).

[175] *PG Publ. Co. v. Aichele*, 705 F.3d 91, 115 (3d Cir. 2013).

[176] *Id.* (quoting *Dique v. N.J. State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010)).

[177] *Id.* (quoting *Snowden v. Hughes*, 321 U.S. 1, 8 (1944)).

[178] *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

[179] J.A. 965.